**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

| | |
|---|---|
| LIZANDRA VEGA,                        : | |
|                                  : | Civil Action No.: |
|                Plaintiff,       : | |

Plaintiff Lizandra Vega, by and through her attorneys, Wigdor LLP, as and for her Complaint against Defendants Hästens Beds, Inc., Hästens Sängar AB and Hästens Ltd. ("Hästens" or the "Company") and Hästens' founder, owner and Chief Executive Officer ("CEO"), Jan Ryde, in his individual and professional capacity (collectively "Defendants"), hereby alleges as follows:

**SUMMARY OF CLAIMS**

1.      Hästens is a Swedish, family-owned company that manufactures horsehair mattresses that retail for as much as $400,000.

2.      Owners of beds made by Hästens include members of the Swedish Royal Family, the President of Russia Vladimir Putin and celebrities such as Tom Cruise, Angelina Jolie and Drake.[1]

3.      Hästens touts its "role" in the Netflix series *Emily in Paris* during which an entire scene takes place with characters on top of a Hästens bed in the streets of Montmartre:[2]

---

[1]      https://elitemen.com.au/heres-the-reason-why-drakes-bed-is-the-ultimate-luxury-bedroom-flex/

[2]      https://www.whatweadore.com/hastens-guest-star-of-emily-in-paris-the-new-netflix-series/



4.      Hästens claims that there is a waiting list of people willing to pay $400,000.[3]

5.      While the manufacturing base remains in Köping, Sweden, the Company sells its horsehair beds throughout the world, including at flagship stores located in Manhattan and Paris.

6.      For the last 30 years, Jan Ryde has controlled his fifth-generation family business and currently serves as the CEO and Executive Chairman.

7.      In January 2020, Ms. Vega, a successful and well-regarded executive recruiter with over 20 years' experience, joined Hästens.  Sadly, she experienced a deeply misogynistic and sexist work culture.

8.      In a textbook tale, Ms. Vega's brave conduct in reporting the unlawful discrimination led to immediate retaliation and her subsequent termination.

9.      While Mr. Ryde's unlawful conduct described below speaks for itself, it stands in stark contrast to the laudatory and at times, gushing praise lavished on Mr. Ryde for his ability to deliver a product to customers who are "highly discerning, quality obsessed individuals who are always one step ahead of the lifestyle curve."[4]

---

[3]      https://news.artnet.com/partner-content/hastens-mattress
[4]      https://www.forbes.com/sites/katiekiefner/2020/04/20/the-new-400000-bed-that-already-has-a-waiting-list/?sh=2f56e03e1d5d

2

10.     There is nothing "highly discerning" or "ahead of the curve" about a CEO and other male executives perpetrating disturbing and unlawful sexual harassment on their female employees.

11.     Although too many incidents exist to include in this Complaint, set forth *infra* are numerous examples of an appalling workplace.  By way of example only, on November 16, 2020, Mr. Ryde sent 18 of his top-level employees, including Ms. Vega, an email that contained a link to a video to watch.  This video included vulgar and disgusting language such as:

- **"tits"**
- **"cocksuckers"**
- **"motherfucking"**
- **"jacking off"**
- **"having sex"**
- **"cunts"** and
- **"bitch."**

12.     The narrator of the nearly 15-minute-long video says **"fuck"** within the first three minutes and never stops using the word throughout.

13.     Disgustingly the video contains footage of a lion killing live prey.  Under the pretense of being a "sales training" video, the narrator compares salespeople to lions and comments that the male lion had to make the kill because he "got tired of waiting" for the female lion to do it. The female lion was called the **"bitch."**  In reference to the only woman in the video is the comment: **"[her]** **"tits are just right."**

14.     While watching the video, Ms. Vega shook uncontrollably.

15.     Mr. Ryde flippantly described the video as containing "grown up language."

16.     This was not the first time Ms. Vega and other female employees were forced to endure vulgar, sexist and misogynistic behavior as part of their work environment.

3

17.    Just two months earlier, Marybeth Gregg, the Global Head of Human Resources for Hästens dared to complain to Gregory Downey, Mr. Ryde's right-hand man, personal advisor and "mindset coach" about similar blatant sex harassment involving another "training video" presented to employees.  Ms. Gregg's email to Mr. Downey dated September 15, 2020 reads in part:[5]

- "At risk of being called too sensitive, I must bring to your attention that using videos that include this type of profane language is totally unnecessary, unprofessional, certainly not "world class" or how we want our employees to behave, and can leave the company open for legal claims."

- "Turning a blind eye to slurs about race, gender, ethnicity, or sexual orientation, as well as sexual innuendo, can leave employers open to claims of harassment and hostile work environments."

- "As part of my role as head of HR, I must go on record to say we cannot have this going forward. I have gotten a number of text messages from people (not all women) saying this went over the line."

- "I feel I have stuck my neck out in saying this but it is too important to be silent."

18.    No female employee much less the Global Head of Human Resources should fear being labeled "too sensitive" or worried that she "stuck her neck out" for complaining about conduct in the workplace that blatantly violates the federal, state and city anti-discrimination laws.

19.    It soon became clear why Ms. Gregg feared to perform the very job she was hired to do.  Despite her warning in September, Mr. Ryde went ahead and sent the November 16, 2020 video.  After Ms. Vega and other employees complained to her about it, Ms. Gregg dared to complain to Mr. Ryde.

---

[5]    Every quote in this Complaint is from an email, text message, published news article or recorded or videotaped conversation.

4

20.     Suddenly, Ms. Gregg was mysteriously banished and excommunicated from the Company.  Ms. Vega and other employees were forbidden from any contact with Ms. Gregg.  The Company's message about what happened to Ms. Gregg after she dared to complain is sickening:



21.     As evident – Hastens pitched Ms. Gregg's involuntary banishment from the workplace as a "new journey," claiming that she needed to "renew" her dedication and "personal charge" so that she is "fully transparent and authentic."   Ms. Gregg's new journey because she complained about sexual harassment was anything but voluntary.

22.     As the leader of his family business, Mr. Ryde enjoys unfettered control over his employees. In addition to ubiquitous profanity, unprofessional and unlawful conduct within his own workplace, Mr. Ryde frequently felt emboldened to say vile and disturbing things about other people, including purchasers of the $400,000 Hästens bed.

23.     For example, as recently as January 13, 2021, during a group Zoom with over 114 Hästens employees, Mr. Ryde outrageously said:

**"Vladimir Putin is happier since he bought a Hästens bed
and now kills less people because of it."**

24.     Worse, this is not the only time Mr. Ryde made this horrific comment.

25.     Ms. Vega and numerous other employees heard him say the exact comment during his Company-wide "Holiday Address" on December 11, 2020, also via Zoom.[6]

26.     As an example of how Mr. Ryde treats his employees, in addition to the Vladimir Putin comment, during the same January 13, 2021 Zoom, he expressed his frustration that some employees had their video function on mute:

> "Let's see if I can also get the galleries.
> I see you all...**all the losers who have their screen off –**
> **<u>fuck off or open up your screens</u>.**
> You're either in or you're out.
> It's your choice, you know **(it's clearly not)."**

27.     Based on Mr. Ryde's repeated flouting of the very laws designed to protect employees such as Ms. Vega and Ms. Gregg, it should come as no surprise that shortly after he learned that Ms. Vega had complained about the content of the November 2020 video, including to the General Counsel of Hästens, Tim Dillon, Ms. Vega was retaliated against and fired.  After Ms. Gregg complained to Mr. Ryde and subsequently was banished, Mr. Ryde suddenly and inexplicably excluded Ms. Vega from all of his email communications going forward.

28.     Ms. Vega was isolated and cut-off until she received a call on January 7, 2021 from Ms. Gregg's replacement who told her that she was fired.

---

[6]     Hästens records its internal Zoom conference calls.

29.     It gets worse.  In the most despicable fashion, Hästens seized upon the horror of Covid-19 and in a sham conditional offer said that Ms. Vega would not be fired "if" three days a week (Monday, Wednesday and Friday), she physically travelled into New York City to work at a WeWork office.  Incredibly, the Company said her pay would be reduced by fifty (50%) percent.

30.     Outraged, Ms. Vega, who had been performing work from home, asked why it was necessary for her to travel to a WeWork office in the middle of a pandemic when rates of infection were spiking and city leaders repeatedly urged individuals to stay home unless absolutely necessary.  Pathetically, Hästens told Ms. Vega that she needed to go in person to "train her eventual replacement."

31.     When Ms. Vega refused to agree to this sham offer that was an attempt to get her to quit, she was fired <u>for the second time</u> on January 26, 2021.

32.     No female employee should have to work under such conditions or fear termination for speaking out about unlawful bias.

### **Mind Control, Hypnotists and Clairvoyants**

33.     Yet, against this backdrop, a closer examination of the Hästens work culture reveals another level of bizarre and deeply troubling conduct.  It is not enough that employees perform their work and strive to do their best.  At Hästens, Mr. Ryde demands that his employees accept and adhere to a set of spiritual beliefs and practices far outside the bounds of what is considered lawful control of employees while performing work.

34.     Indeed, as described below, Ms. Vega and her colleagues were subjected to scrutiny and oversight by Mr. Ryde's personal team of "mindset" coaches, complete with personal hypnotists, prophesiers of "enlightenment" and "high frequency vibration" individuals.

35.     Incredibly, Ms. Vega was expected to use this same matrix of belief systems to source and recruit executive talent.  To force employees to use such a subjective and mystical approach to executive recruiting was a recipe for disaster – especially since Ms. Vega was told to disregard resumes and candidates' past work experience in order to recruit people that were "cooler," "younger," "more authentic," or that had "enough self-love" and "abundance."

36.     Following Ms. Gregg's banishment and the retaliation against Ms. Vega for complaining, Ms. Vega was subjected to increased scrutiny about her ability (or perceived willingness) to follow Mr. Ryde's personal belief systems that include *inter alia*, the Law of Attraction, Graves Spiral Dynamics Integral philosophy, the Hawkins' Scale of Enlightenment, the *Four Agreements*, as well as systems that assess vibrational frequencies and "light" within individuals, as instructed by Peter Von Ah, a clairvoyant and hypnotist on the Hästens company payroll.

37.     Shockingly, as part of her job, Ms. Vega was subjected to this barrage of orchestrated belief systems that was meant to and did in fact impact the way she thought and approached all aspects of her life – not simply executive recruitment.  Such mind control is akin to forced religious doctrine and has no lawful place in any work environment.

38.     Disturbingly, numerous employees at Hästens continue to be subjected to such forced belief systems on a daily basis.[7]

39.     During her employment and continuing through the present, employees were required to attend daily coaching sessions led by Mr. Downey.  The daily mindset sessions had titles such as "intention mapping" or "self-reflection" or otherwise involved some type of spiritual or metaphysical theme.

---

[7]     Plaintiff reserves the right to amend her Complaint to proceed as a potential Class Action on behalf of herself individually and as a representative of a proposed Class of employees.

40.     Because Hästens is a company that builds beds and mattresses and generates profits by selling its beds and mattresses, the training sessions and policies allegedly were targeted towards furthering that purpose.   Nevertheless, the belief systems are religious in nature – focusing on metaphysical and fundamental questions about life, such as questioning employees' moral and ethical beliefs, and ultimate ideas about one's "purpose" and place in life.   In short, discussing, much less developing Ms. Vega's "connection to God" or to "the Universe" had no role in the workplace.

41.     Just as no female employee should have to fear termination for speaking out about unlawful gender bias, no employee should have to fear discipline or termination for failure to abide by a system of beliefs that is essentially religious in nature.

42.     Ms. Vega commences this action in order to hold Hästens accountable for the horrific discrimination and retaliation that it engages in with impunity.

## JURISDICTION AND VENUE

43.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions under 42 U.S.C. §§ 2000e *et seq*.   The Court has supplemental jurisdiction over Plaintiff's claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

44.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

45.     Plaintiff Lizandra Vega was at all relevant times an "employee" of Defendants under all relevant statutes.  Ms. Vega is a resident of the State of New York.

46.     Defendant Hästens Beds, Inc. is headquartered at 500 Seventh Avenue, 8th Floor, New York, New York 10018.  At all relevant times, Defendant Hästens Beds, Inc. met the definition of "employer" under all applicable statutes.

47.     Defendant Hästens Sängar AB operates throughout the United States and in New York, with offices at 500 Seventh Avenue, 8th Floor, New York, New York 10018.  At all relevant times, Defendant Hästens Sängar AB met the definition of "employer" under all applicable statutes.

48.     Defendant Hästens Ltd. operates throughout the United States and in New York, with offices at 500 Seventh Avenue, 8th Floor, New York, New York 10018. At all relevant times, Defendant Hästens Ltd. met the definition of "employer" under all applicable statutes.

49.     Defendant Jan Ryde is the owner and CEO of the respective corporate entities, collectively, "Hästens."  Mr. Ryde had the authority to direct Plaintiff's work activities, assign her job responsibilities and monitor her performance.  Accordingly, at all relevant times, Mr. Ryde was a "supervisor" within the meaning of all applicable statutes.

## ADMINISTRATIVE REQUIREMENTS

50.     Prior to the filing of this complaint, Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  On March 23, 2021, Plaintiff was issued a Notice of Right to Sue.

51.     Pursuant to New York City Human Rights Law ("NYCHRL") § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights within ten days of its filing, thereby satisfying the notice requirements of this action.

52.     Plaintiff has complied with any and all other prerequisites to filing this action.

## FACTUAL ALLEGATIONS

**I.     Vega's Background and Immediate Success at Hästens**

53.     Ms. Vega is a successful executive recruiter with more than 20 years of experience in both domestic and international markets.

54.     In January 2020, Ms. Gregg hired Ms. Vega to source and recruit executives to work in various U.S. store locations.  Her primary responsibility was sourcing and recruitment; however, at Ms. Gregg's request, she also created new forms and templates, such as intake forms for current and future vacancies, job posting templates, interview forms and relevant questions for hiring managers to use, as well as writing interview guides for the Company.

55.     Ms. Vega reported to Ms. Gregg, who in turn reported directly to Mr. Ryde.

56.     In late March 2020, when the realities of the Covid-19 pandemic manifested, Hästens asked Ms. Vega also to work sourcing and recruiting executives on a global basis, including to find talent for Hästens' positions located in Sweden, the United Kingdom, Netherlands, Norway and Malta.

57.     Simply too many examples exist to list here of how Hästens directly and immediately benefited from Ms. Vega's work performance.  She quickly discovered the underutilization of technology in recruiting at the Company and single-handedly on-boarded Hästens to technology platforms used by most global businesses.

11

58.     By way of example only, due to Ms. Vega's initiatives, she identified and developed the processes necessary to utilize a Swedish applicant tracking system called "Teamtailor," a platform that Hästens had been paying for but not using.

59.     Solely due to Ms. Vega's efforts, Hästens quickly was able to take advantage of this online branding and recruiting service.   She also obtained a pilot LinkedIn Recruiter license. Because of her work, Hästens was able to source and support online ads and draw traffic to the Hästens career site – something that *for years* had little to no traffic before Ms. Vega was hired.

60.     Ms. Vega successfully sourced and recruited key executives that were hired and received nothing but positive feedback about their performance.

## II.     Mr. Ryde Forces Employees to Adopt His Own Belief Systems
##         as a Condition of Employment

61.     In July 2017, Mr. Ryde hired Gregory Downey to work full-time in a 1:1 coaching position between Mr. Ryde and Mr. Downey.   In 2018, Mr. Ryde transitioned Mr. Downey to a newly created position at Hästens called "Global Mindset and Culture Lead."

62.     Mr. Ryde created the position for Mr. Downey for the purpose of instructing Hästens employees about how to develop a "positive mindset" using the philosophy of the "law of attraction."   This belief system suggests that individuals can attract abundance in their lives as a result of offering a positive mindset to the universe.[8]

---

[8]     Numerous online resources discuss the philosophy, see:
https://en.wikipedia.org/wiki/Law_of_attraction_(New_Thought);
https://www.verywellmind.com/understanding-and-using-the-law-of-attraction-3144808;
https://www.thelawofattraction.com/what-is-the-law-of-attraction/; and
https://www.psychologytoday.com/us/blog/the-blame-game/201609/the-truth-about-the-law-attraction.

63.     Each work day, Mr. Downey leads Hästens employees in 30-minute sessions about how to abide by the law of attraction and other "mindset" beliefs.  Often, he offered two different sessions.

64.     Such daily mindset sessions were not optional.  Although Hästens messaged that attendance was not required, only "highly recommended," the conduct of Mr. Ryde and Mr. Downey showed that it was effectively mandatory.

65.     Specifically, Mr. Ryde attended at least one mindset session each day, sometimes two.  During these sessions, Mr. Ryde openly tracked who was there and who was not in attendance.  Ms. Vega knew that her failure to attend would bring immediate negative consequences, as she would be viewed as not committed and not performing.

66.     If an employee dared attend the mindset session without their video camera on, Mr. Ryde openly berated them.

67.     Unquestionably, employee attendance and participation were a part of daily required "work" for many employees, including Ms. Vega.  For example, after one session in which Mr. Downey believed attendance was too low, he sent the following email seeking to shame employees:



68.    Further, as described *infra*, Hästens' Employee Handbook specifically threatened that failure to attend mindset coaching sessions would be considered a violation of policy: "If your department lead tells you not to take advantage of mindset coaching or that you do not need to work with a mindset coach, <u>it is a direct violation of company policy and is an attempt to prevent you from reaching your highest potential</u>."

69.    The daily mindset sessions had titles such as "intention mapping" or "self-reflection" or otherwise involved some type of spiritual or metaphysical theme.

70.    Because Hästens is a company that builds beds and mattresses and generates profits by selling its beds and mattresses, the training sessions and policies allegedly were targeted towards furthering that purpose.   Nevertheless, the belief systems were religious in nature – focusing on metaphysical and fundamental questions about life, such as questioning employees'

moral and ethical beliefs and ultimate ideas about one's "purpose" and place in life.  In short, discussing, much less developing Ms. Vega's "connection to God" or to "the Universe" had no role in the workplace.

71.     In addition to the daily sessions, Mr. Downey periodically led a "Hästens 6 Week Breakthrough Group Coaching Series" that focused on the following six topics and promised a "diploma" upon completion:

> "1.     Physical (Body, Health, Home, Recreation, Material Possessions, and Time)
>
> 2.     Mental/Emotional (Feelings/Emotions and Beliefs both Empowering and Limiting)
>
> 3.     **Spiritual (Your connection the divine, source, universe, God, or whatever you choose to call it)**
>
> 4.     Business/Career/Financial (Your current income situation and the way you manage your finances)
>
> 5.     Relationships (Family, Intimate, Business, and Social)."

72.     Mr. Downey sent employees materials to prepare for sessions and often provided follow-up materials.  For example, in July 2020, Mr. Downey sent an email in connection with "Week 3" of the "6 Week Breakthrough Group Coaching Series" that began:

**"That's Right…Your Limiting Beliefs Are Your Prison!"**

73.     The email explained that Hästens employees can be "prisoners of their own beliefs" which is why his "recipe for freedom" should be followed.

74.     Also in July 2020, Mr. Downey sent an email to employees stating that Hästens' workplace goal was to create "an environment that welcomes and protects the freedom of Hästens Team Members to be who they truly are" which was expounded upon by:

> **"to create an environment that vibrates with love or above, it requires being vulnerable enough for others to come to understand you the way that they understand themselves."**

75.    Mr. Downey declared that "Today marks the beginning of a journey into Authenticity, Vulnerability and Love…"[9]

76.    In November 2020, Mr. Downey sent an email containing nothing but song lyrics referencing divinity, spiritual law, mission, to love all and serve all:

**Gregory Downey**
Thu 11/19/2020 4:57 AM

(Intro)
Oh ya oh ya oh ya, ooh ooh
Oh ya oh ya oh ya, ooh ooh
Oh ya oh ya oh ya, ooh ooh….

Om Gam Ganapataye Namaha
Om Gam Ganapataye Namaha
Om Gam Ganapataye Namaha….

(Verse)
Well I said it's time and I know
That without a doubt
The spirit in the soul
Well it's trying to break out
Well this is your time this is my time
To illuminate cause we were made to shine
Divinity by law in our DNA
They lied but we saw truth anyway
This is divine recognition for this time of remission
Time change mission said you have my permission
To be your light let no man dim
To see your sight is not original sin
I said you came in the same way that you will go
And that's with love and with righteousness, heal to the flow

(Chorus)
Well I heard it all before yes, what the man said
Never held it in my heart but I held it in my hand
But then I saw
That it isn't just suggestion, it's spiritual law
To love all serve all and remember Jah

---

[9]    Mr. Downey delivers a podcast for employees about Hästens' belief systems.  <u>See</u> https://soundcloud.com/user-951282688.

77.     Mr. Downey developed a "brand" called "blue check" for Hästens that he claims "completes employees."[10]

78.     In connection with this brand Mr. Downey created an employee handbook called "The Hästens Blue Check Values and Culture Handbook" (the "Handbook"). The Handbook lists some of the values as "Awake," "Enlightened," "Empowered," "Committed," "Open," "Business Minded," "Accountable," "Serving," "Respectful," "Loving" and "Fun."

79.     The Handbook describes the "Blue Check Culture" as "not just a list of slogans," but rather "a reflection of day-to-day behavior" and directs that:

- "You must protect and nurture your mindset."

-  "Avoid spending time with or surrounding yourself with those who have a negative attitude or who speak negatively or who criticize your ambition or who seek to bring you down to a lower level of achievement in life."

- "You must read books, listen to audios, and watch online videos such as TED Talks and other inspiring and insightful content from thought leaders in business, entrepreneurship, leadership, personal development, law of attraction, and overall well-being."

80.     The Handbook explains that a "mindset coach" is a service to help employees "identify and focus on what's important and what will accelerate your success in ALL areas of your life. Not just at work."

81.     Later in the same section, the Handbook threatens:

"If your department lead tells you not to take advantage of mindset coaching or that you do not need to work with a mindset coach, **it is a direct violation of company policy and is an attempt to prevent you from reaching your highest potential.**"

---

[10]     See https://soundcloud.com/user-951282688/Hästens-values-and-culture-audio-version

82.     The Handbook requires that employees read eight books in their first year of work and dictates the order of the first three books.  It also requires that employees "contact the Mindset and Executive Coaching department to schedule a brief discussion about your key takeaways and how you will apply what your learnings in your role as a Hästens Professional."

83.     The Handbook sets forth an important workplace requirement:

> "Part of the Blue Check Culture demands that you write your goals on an index card and keep them on your person at all times while at Hästens. Similar to understanding the information in this guide and being prepared at all times to share your understanding of the information in this guide, you must be prepared at all times to produce your goal card if asked, 'What are your goals?'"

84.     Employees were expected to be able to include on their index cards information how to get "everything they desired in life:"

### The Strangest Secret
📁 Found in Hastens Exchange Account Inbox

Hej Winners,

In our executive power huddle this past Monday, we discussed the power and importance of having a goal card.

You may recall from the Blue Check Values and Culture Handbook that having a goal card with you at ALL Times and In All Places within Hästens is not just a suggestion. We're not telling you that "It might be a good idea if you decide you want to." Having a goal card with you at ALL times and in ALL places within Hästens is a MUST.
Carrying a goal card is a way of saying, "I'm In"… "I'm aligned with the mission and vision of Hästens."
If you haven't fully reviewed the handbook, you can do so in audio form here:
https://soundcloud.com/user-951282688/hastens-values-and-culture-audio-version

We would never ask you to do it if we didn't already know that it works.

A goal card is a powerful tool for achieving everything you desire in life.
We would like you to have your best life possible.
A goal card will get you there sooner than later.

In his classic recording The Strangest Secret, Earl Nightingale talks about having a goal card.
He also talks about carrying it WITH you EVERY DAY and looking at it SEVERAL times a day.

Write your goals on a card.
Carry it with you.
Look at it several times a day.

This audio is one that I have listened to literally HUNDREDS of times.
I would invite each of you to listen to this audio at least once per week.

https://www.youtube.com/watch?v=XAoZYpn6Q0s

Keep Calm and Be Cheerful!!!

--



**Gregory Downey**
*Executive Team/Global Mindset and Culture Lead*

85.     Without question the above directives were conditions of employment at Hästens, including for Ms. Vega.  Mandatory attendance at mindset sessions, adherence to the mandates of the Handbook, including the required reading list and the goal card requirement – all steps in order for employees to follow the "law of attraction" were conditions of the daily workplace.

86.     Although the dogmatic emphasis on spirituality, life outside work and forced belief systems, essentially religious in nature, were troubling to Ms. Vega, it was understood that had she complained, she would not have been "performing" and, therefore, subject to termination.   As such, she followed the rules.

87.     Despite her attempts to conform to these philosophies, Mr. Ryde and his advisors never failed to criticize Ms. Vega and other employees, for their alleged failure to become sufficiently "enlightened" to his belief systems.

88.     By way of example only, in a January 13, 2021 "boot camp" session with over 100 employees in attendance, Mr. Ryde, who regularly grouped employees into what he called the "A Team" and the "B Team" (a group that he declared had failed to sufficiently adhere to the Law of Attraction, Graves' Spiritual Enlightenment principles and his other belief systems), said the following:

- "The value of us making people happy is so huge I will give you the mathematics. It's so huge that we can easily together build a trillion euro company. We can do it very fast...the benefits of this reward is almost infinite value."

- "It's 100% your responsibility if a consumer doesn't buy anything when they enter the store, because they've entered to buy something…the people here in the group who are trained hypnotists…..there is something called 'Charisma.'"

- "The A Team of Salespeople love questions from Keenan. They have a big happy smile. The B Team looks like, 'aww get me out of here.' Maybe because they're uncomfortable with Keenan's language and combative delivery? Are you with me on this? I mean, there is no choice! If you're not with him, you're fired!"

- "Just need to point out people in the A Team and the B Team, because there are people in the A Team who are so FUCKING bored of hearing me say the same story, and they don't know why the FUCK the B Team is still in this meeting."

- "I can't see you all, but I keep track of who has the camera on. I am here! I am demanding as FUCK! I demand that you get at 90% closing rate."

- "In order to apply the 10x growth factor, you have to get rid of your limiting beliefs. If you have even a little bit of limiting beliefs, you will not sell. You have three choices: (1) if something is bothering you about 10x growth talk to Gregory (Downey), and you are good to go; (2) behave like an ostrich and pretend this goes away; it will not because I am here and as long as I am here, YOU WILL BE ABUSED with 10x growth...and (3) use Gregory's advance goal-planning. We want the SHIT to come up as fast as possible. The Universe is signaling to help us."

89.     Adding to the extraordinariness of the force-fed spiritual beliefs were the obvious contradictions between what employees were expected to do and the conduct displayed by Mr. Ryde and his trusted advisors, including the above speech by Mr. Ryde to employees using profanity and threats of being fired if an employee dares to question him.

90.     A cursory glance at Mr. Downey's social media footprint shows that Mr. Downey is anything but a teacher of ethics, open-mindedness, positivity or the law of attraction to any employee, as his nearly daily barrage of conspiracy theories and obscene posts got him temporarily banned from Facebook.[11]   He similarly was banned from Twitter.

91.     A prolific Facebook poster, Mr. Downey's posts are full of conspiracy theories, political proclamations and content denying science.  Several recent posts displayed in March 2021 are included below:

- "Screw You M@rk Zukk. You're a dirty f@scist."[12]

- "And Screw your lopsided 'Community Standards' and your Fake 'Fact Checkers'…. May your stock values plunge into the toilet"[13]

- "They are using Covid to control you…Wake Up Sheeple"[14]

---

[11]     https://www.facebook.com/GREATitudeCoach/posts/10223006843653620
[12]     https://www.facebook.com/GREATitudeCoach/posts/10223006917575468
[13]     https://www.facebook.com/GREATitudeCoach/posts/10223006917575468
[14]     https://www.facebook.com/GREATitudeCoach/posts/10223096014442834

- "Because Europe…" (posted with a photograph of naked people running on a beach on a bag of Tyrrell's brand potato chips)[15]

- "They cannot stop what is coming…" (posted with a photograph of Donald Trump at a rally held immediately before the storming of the Capitol led by followers of Trump who believe conspiracy theories about voter fraud)[16]

- "The two faced swamp rats have come out of the sewers… Their words for the past four years have all been lip service. Now they are in career preservation mode. They will be voted out at the mid term."[17]

- "Make no mistake, there is a war that is happening right now. And it's not a war of political opinions, of right versus left or a war of nations.

- The war is for CONTROL of YOUR MIND.

- And most people are losing this war…**Whether you know it or not, like it or not, and even accept it or not, you are being brainwashed. You are being hypnotized. You are being controlled by other people's agendas."**[18]

92.     It is incomprehensible that Hästens deems Mr. Downey qualified to coach morality and wellness to its employees and allows him to continue forcing daily coaching sessions.[19]

93.     That Mr. Ryde placed Mr. Downey in a position of influence – and has fostered an increase of his influence on employees, including executive decision-making – is confounding.

---

[15]     https://www.facebook.com/GREATitudeCoach/posts/10223074371701779
[16]     https://www.facebook.com/GREATitudeCoach/posts/10223007968561742
[17]     https://www.facebook.com/GREATitudeCoach/posts/10222909725585729
[18]     https://www.facebook.com/GREATitudeCoach/posts/10223128647098630
[19]     Among other publications, in 2019 Mr. Downey wrote *Attracting Miracles: and My Secret Life as a Miracles Coach*, published by Motivational Press, a non-BBB accredited company.

III.    **Mr. Ryde Forces Ms. Vega to Evaluate Candidates Based on Mindset Beliefs Rather than Industry Metrics**

94.    During the summer of 2020, Mr. Ryde made decisions that placed increased power and control in Mr. Downey to weigh in on executive recruiting decisions made by Ms. Vega and Ms. Gregg.

95.    Although Mr. Downey's work background and training has nothing to do with sourcing, recruiting or hiring global executives, Mr. Ryde decided that Mr. Downey would play an integral role in the hiring process.

96.    Beginning on June 3, 2020, Ms. Vega was assigned to meet with Mr. Downey for one-on-one "sessions."

97.    In July 2020, Ms. Vega was told by her superiors that she needed to involve Mr. Downey in the talent recruiting process.  Specifically, he was to be consulted before potential candidates went on to meet the hiring manager or functional leads for the jobs for which they were being considered.  Prior to this, Ms. Vega had been running the executive recruiting process from beginning to end on her own.

98.    Keenly aware of the influence and power vested in Mr. Downey by Mr. Ryde, Ms. Vega followed instructions and involved Mr. Downey in decisions.  Ms. Vega also was aware that Mr. Downey had started mentoring Mr. Ryde's 24-year-old son, David Ryde.

99.    That summer, Mr. Ryde created a new "panel" that essentially oversaw executive recruitment.  The members of the new "panel" were Mr. Ryde, his sons David and Lukas (27 years-old) and Mr. Downey.  Mr. Ryde pronounced that the "panel" would conduct all executive interviews and make the final hiring decisions.

100.    For over 20 years, Ms. Vega, along with her established peer group of talent recruiters, had evaluated potential candidates on commercial skill sets, executive experience, prior

job responsibilities and corporate successes.  Suddenly the objective metrics were cast aside as Ms. Vega and Ms. Gregg were ordered to follow Mr. Ryde, Mr. Downey, and yet another new, trusted advisor of Mr. Ryde: Peter Von Ah.[20]

101.    Briefly, Mr. Von Ah works as Mr. Ryde's personal hypnotherapist and clairvoyant. His outrageous proclamations are voluminous and cannot be included here.  Just as one example, Mr. Von Ah's outlandish social media posts depict his philosophy and approach:



102.    Mr. Von Ah's YouTube Channel claims that a lack of clarity is caused when "neurons are building and building and growing and growing like crazy."[21]

103.    Employees watched as Mr. Von Ah's influence over Mr. Ryde continued to escalate.

104.    In this regard, Mr. Von Ah charges exorbitant fees to Hästens to "advise" Mr. Ryde on employee issues, based on such bizarre beliefs about the "vibrational" levels of employees.

105.    Troublingly, Mr. Von Ah charges fees to individual Hästens employees in order to obtain one-on-one sessions with him.

---

[20]    https://peter-vonah.com/; https://peter-vonah.ch/english; https://www.infocuslondon.me/entertainment/haestens-brings-168-year-old-sleep-expertise-to-the-digital-world-with-launch-of-new-complimentary-app

[21]    https://www.youtube.com/watch?v=4B6tbxXWiL8

106.    Contrary to decades of professional experience in executive recruitment, Ms. Vega and Ms. Gregg suddenly had to render assessments about job candidates based on highly subjective dubious and non-relevant factors, such as a candidate's "winning mindset," "inner joy," "inner peace," "inner gratitude" or whether he or she was "full of light."

107.    Indeed, shortly after Mr. Downey assumed his role as part of the "panel," that was essentially the new hiring committee, Mr. Ryde paid far less attention to candidates' CVs – stating that he:

> Preferred a "19 year old Swedish champion in Surfing to be a store manager" over "someone with 30 years' experience unless that person[']s min[d]set also is pure as Snow White."

108.    In early September 2020, Mr. Ryde specifically told Ms. Gregg and Ms. Vega that going forward, he would be overseeing and delegating all recruitment efforts and that they would be carrying out his directives.

109.    In fact, during a meeting with him on September 11, 2020, Mr. Ryde announced that he was officially the new head of HR, a role previously assigned to Ms. Gregg.

110.    From that point forward, Mr. Ryde micro-managed all aspects of the interview and hiring process because he claimed that it was critical they **hire the top 1% of top 1% of talent with the right vibrations and frequencies.**

111.    For purposes of interviewing and hiring, Mr. Ryde designated Mr. Downey as his "alternate" decision-maker should Mr. Ryde be unavailable.

112.    Mr. Ryde placed such trust in Mr. Downey that in the case of one potential candidate, he said, "*If Gregory says so* – I am confident he can coach her to being an awesome sales leader."

25

IV.     **Mr. Ryde Imposes Additional Thought and Belief Systems on Employees**

113.    Compounding the confusion through which Ms. Vega was supposed to be sourcing, recruiting and hiring global executive talent was Mr. Ryde's decision, also in September 2020, to require employees to implement and use another "philosophy" that he followed, specifically the Clare W. Graves Spiral Dynamics Integral philosophy ("Spiral Dynamics").[22]

114.    On top of Spiral Dynamics, Mr. Ryde insisted employees, including Ms. Vega use another "thought process" called the David Hawkins' Scale of Enlightenment.  To be clear, the David Hawkins' Scale of Enlightenment is a model based on assessing individuals' **vibrations and frequencies**.

115.    In short, Dr. Hawkins developed what he called a map of the levels of human consciousness in which higher frequencies and vibrations (purportedly identifiable by others) are considered superior.[23]

116.    Rather than evaluating executives to potentially hire based on work experience, education backgrounds and corporate or financial skill sets, Ms. Vega now had to follow the Spiral Dynamics philosophy as well as "evaluate" candidates by their "vibrations and frequencies." [24]

---

[22]     Numerous online resources discuss the philosophy, see https://en.wikipedia.org/wiki/Spiral_Dynamics; https://www.landsiedel.com/en/nlp-library/spiral-dynamics.html; http://www.clarewgraves.com/theory.html

[23]     Numerous online resources discuss the philosophy, see https://livelearnevolve.com/the-17-levels-of-human-consciousness-with-dr-david-hawkins/; https://www.artofwellbeing.com/2016/11/08/mapofconsciousness/; https://www.spiritualteachers.org/david-hawkins/

[24]     Mr. Ryde also adheres to teachings in a book called "The Four Agreements," that he ordered his employees to read because he expected them to be versed in its contents.

117.    Incredibly, despite such directives and his own alleged allegiance to higher levels of thought, on September 11, 2020, Mr. Ryde told Ms. Vega that she needed:

**To hire some "hot young recruiters[.]"**

118.    Mr. Ryde told Ms. Vega to do this in order to help Ms. Vega:

**"Attract the right vibrations."**

119.    On September 22, 2020, Mr. Ryde evaluated a candidate approved by Mr. Downey and wrote in an email:

- "Kudos for finding someone younger (although I mean younger than before - not as our partners who find super people when they are 19)."

- "Kudos for finding someone better and cooler."

- "We are moving in the right direction. Not there yet, not good enough, nor cool enough, not authentic enough, not the right mindset enough, not enough self love, love, peace, joy, abundance, but soon."

120.    Mr. Ryde often arbitrarily "decided" whether people had what he called the "gift" or not. According to Mr. Ryde, a person had to be "anointed with the gift" in order to "attract talent" to Hästens.  Mr. Ryde accused Ms. Vega of not having the "gift."

121.    During the fall of 2020, Mr. Ryde increasingly criticized Ms. Vega and Ms. Gregg for their purported failure to properly master the Hästens' required belief systems.  Too many examples exist to include, but by way of example only, Mr. Ryde emailed the two female employees the following:

**From:** Jan Ryde <jan.ryde@hastens.se>
**Sent:** Wednesday, October 21, 2020 4:33 PM
**To:** Lizandra Vega <Lizandra.Vega@hastens.se>; Marybeth Gregg <marybeth.gregg@hastens.se>; Gregory Downey <gregory.downey@hastens.se>
**Cc:** David Ryde <david.ryde@hastens.se>; Lukas Ryde <lukas.ryde@hastens.se>
**Subject:** Re: Post interview follow-up

Dear Lizandra,

Okay, I understand.
- Lets go directly to action now; 

1

@Lizandra, now full STOP briefing the candidates.

@Marybeth, now full STOP briefing the candidates. How many times have we told you to STOP briefing candidates?

Hope you understand you are trying to help people when they don't need that help and the help is to their BIG disadvantage. In fact the more you help people the more fucked up they act in the interview. Please work with Gregory until this is perfectly clear.

- Your have falling victim for Graves 6 values, of wanting to help people when people don't need that help. Just love yourself more.

- You have to now move into Graves 7 and understand you don't need to help any more, and the more you help the worse it gets. In Hästens we serve people and do what bes serve people.

Because people who moved to Graves 7 do understand the difference between helping and serving people.
- Helping is the opposite to serving, and also opposite to supporting. We want to support and serve, but never ever help people. Of course we help people if they are about to die, but otherwise we serve better by just support, coach and love.

2

@Gregory and Marybeth, please also delete the word "respect" from our values and from any other place, like job descriptions. Both the wrong candidates when up the justice tree here.

Because we have "Love" already.  Authentic is much better than respect.
- Respect is a terrible and low vibration, and with Graves 6th values get even worse. A greves 7 is AUTHENTIC.

122.    Also in October Mr. Ryde emailed Ms. Vega, the HR team, his two sons, and Mr. Downey demanding that they only recruit "fully authentic people," and directed the HR team to "free yourself from all past experiences and what you know or think about recruitment and this new paradigm will appear."

**V.    Sexist, Homophobic and Vulgar Videos Used as "Training Materials"**

123.    In September 2020, Mr. Downey played a video during one of his Hästens employee coaching sessions.  The video was made by Jim Kennan, who promotes his own sales training materials online, in social media and on podcasts.

124.    Mr. Keenan's offensive and abrasive approach is articulated in the introduction to his Podcast, *Gap Sell Keenan,* that begins by him telling the audience:

**"you f\*ckin irritate the shit out of me."**[25]

125.    Mr. Keenan's abrasive and aggressive style permeates all of his work and is widely available online on his YouTube channel and Twitter.

126.    In a recording of one of his appearances, one of his first lines was:

"anyone here who's sensitive, P.C. or whatever… not to be an ass but you might want to go now."[26]

127.    Mr. Keenan proudly publicized the fact that he was prohibited from boarding a United Airlines flight because of the offensive, profane T-shirt he was wearing.[27]

128.    Immediately following the Hästens employee session in which Mr. Downey played a video made by Mr. Keenan, Ms. Gregg sent an email to Mr. Downey about how inappropriate it was:

---

[25]    https://podcasts.apple.com/us/podcast/gap-sell-keenan/id1540819806
[26]    https://www.youtube.com/watch?v=WMd3YUVw2c0
[27]    https://twitter.com/keenan/status/1175021870372085762

From: Marybeth Gregg <marybeth.gregg@hastens.se>
Subject: Video
Date: September 15, 2020 at 10:44:11 AM EDT
To: Gregory Downey <gregory.downey@hastens.se>

Hi Gregory,

At risk of being called too sensitive, I must bring to your attention that using videos that includes this type of profane language is totally unnecessary, unprofessional, certainly not ' world class'  or how we want our employees to behave, and can leave the company open for legal claims. It also totally takes away from his message .  I would ask that you you think about using this type of role model in any training.  Turning a blind eye to slurs about race, gender, ethnicity, or sexual orientation, as well as sexual innuendo, can leave employers open to claims of harassment and hostile work environments.

As part of my role as head of HR, I must go on record to say we cannot have this going forward. I have gotten a number of text messages from people (not all women) saying this went over the line.

If we think that we can say anything in a work environment and feel that profanity is acceptable, and others need to adapt,  it is not.  And we cannot come down hard on people who react 'negatively'

I feel I have stuck my neck out in saying this but it is too important to be silent. I would love to discuss this with you, Gregory.

Thank you!

Marybeth


**Warm Regards,**

**Marybeth Gregg**
**Global Lead People and Talent**
New York, New York USA

Hästens

www.hastens.com
FULFILLING DREAMS SINCE 1852

129.    Just minutes later, Mr. Downey unleashed his response:



130.     Despite his offensive conduct, Mr. Ryde became so infatuated with Mr. Keenan's work that he hired Mr. Keenan to work as Hästens' internal sales "boot camp trainer" soon after Mr. Downey featured the above-referenced video on September 15, 2020.

131.     Mr. Keenan's boot camp sessions occurred each month.

132.     Because Mr. Ryde openly uses excessive profanity, it was not surprising to Ms. Vega and other employees that Mr. Ryde was not offended by the videos.

133.     In fact, Ms. Vega and Ms. Gregg had discussed the problem numerous times.

134.     Despite Ms. Gregg's complaint to Mr. Downey set forth above, on November 16, 2020, Mr. Ryde sent a number of his employees, including Ms. Vega, an email that contained a link to a video:

**From:** Jan Ryde <jan.ryde@hastens.se>
**Sent:** Monday, November 16, 2020 5:18 AM
**To:** Johan Lindbäck <johan.lindback@hastens.se>; Mattias Nilsson <mattias.nilsson@hastens.se>; Mikael Brandt <mikael.brandt@hastens.se>; Sara DiCarlo <sara.dicarlo@hastens.com>; Robert Santarsiero <robert.santarsiero@hastens.se>; Lillian Liang <lillian.liang@hastens.se>; Joachim Vieglins <joachim.vieglins@hastens.se>
**Cc:** Cinthya Werneck <cinthya.werneck@hastens.se>; Marybeth Gregg <marybeth.gregg@hastens.se>; Lizandra Vega <Lizandra.Vega@hastens.se>; Gregory Downey <gregory.downey@hastens.se>; Mattias Bergdahl <mattias.bergdahl@hastens.se>; Andreas Wilson <andreas.wilson@hastens.se>; Robert Carlén <robert.carlen@hastens.com>; Deborah Fell <deborah.fell@hastens.se>; Anna Wahlström <anna.wahlstrom@hastens.se>; Lukas Ryde <lukas.ryde@hastens.se>; David Ryde <david.ryde@hastens.se>
**Subject:** Re: PS I got this picture sent to me, I just had to send it on to you. 🙂

😂😂😂😂

Just like explained in this video

https://www.youtube.com/watch?v=GOK2A0fzlQo

Timestamp from 8:43, some just waitng for the right customer instead of catching what is just in fornt of them all time.

The most successful do minimum 1800 cold calls.

❤️

With an abundance of Love

Jan

PS Full disclaimer for the grown up language of Dan when he explains.

135.    The link was to a 15-minute YouTube video featuring Dan Pena (the "Pena Video") in which Mr. Pena says "fuck" within the first three minutes and never stops using the word throughout.

136.    The Pena Video features other vulgar and inappropriate language including but not limited to:

- **"tits"**

- **"cocksuckers"**

- **"motherfucking"**

- **"jacking off"**

- **"having sex"**

- **"cunts" and**

- **"bitch"**

137.    During the video, Mr. Pena says that a female attendee's: **"tits are just right."**

138.    Outrageously, the Pena Video also contains footage of lions killing live prey.  Mr. Pena compares the lions to salespeople.

139.    Mr. Pena states that the male lion had to jump in to hunt because he "got tired of waiting" for the female lion that he referred to as a "bitch" to do it.

140.    Mr. Ryde intended for his employees to pay special attention to the portion of the video comparing the lions to salespeople as he referenced the specific timestamp (8:43) in his email.

141.    Mr. Ryde flippantly described the video as containing "grown up language."

142.    During and after the Pena Video, Ms. Vega shook uncontrollably.

143.    Extremely upset, Ms. Vega reached out to Ms. Gregg to ask what was going to be done about the untenable situation.

144.    Ms. Gregg communicated to Ms. Vega that she personally would speak to Mr. Ryde about it.

145.    Ms. Vega discussed how troubled and upset she was about the video with other female employees, including Cinthya Werneck, the Global People & Talent Lead/Head of HR and Laura Brookbanks, a Global HR Manager.

146.    Ms. Brookbanks texted Ms. Vega that she had already heard from several others who were troubled and upset about the Pena Video.  The emails are set forth below:



From: Marybeth Gregg <marybeth.gregg@hastens.se>
Sent: Wednesday, November 18, 2020 7:52 AM
To: Lizandra Vega <Lizandra.Vega@hastens.se>; Laura Brookbanks
<Laura.Brookbanks@hastens.se>
Subject: Re: Dan Pena, JUST DO IT.

Hi. I find this really offensive to send out to the group. I sent a note to Cinthya
to discuss privately with her  not in HR mtg
Thanks
Mb


Sent from my iPhone

LB  Laura Brookbanks                                  11/18/20
    To: Marybeth, Lizandra >

Re: Dan Pena, JUST DO IT.

Hi
I wasn't in CC on the original email. But I have had 2 employees
raise issues with it to me.
I'd be interested to know Cinthya's feedback on the video.

Thanks

L

Get Outlook for iOS

See More

147.    As evident, Ms. Brookbanks claimed that she had not watched the video herself but said that she **already had received complaints from two employees about it**.

148.    Additionally, on November 16, 2020, Ms. Vega sent an email to Tim Dillon, Hästens General Counsel, to complain about the Pena Video, and following his non-response, she called him.

149.    In an attempt to avoid any responsibility or action, Mr. Dillon told Ms. Vega that he had not watched the Pena Video.

150.    This was not the first offensive Pena Video shown to employees.  By way of example only, on May 6, 2020, Mr. Downey distributed a Pena video "2020 GO HARD MINDSET" in which Mr. Pena lauds Steve Jobs, Elon Musk, Warren Buffett and says they are great because these men are **"ball busters."**

VI.    **Mr. Ryde Retaliates Against Ms. Gregg for Complaining**

151.    Shockingly, shortly after Ms. Gregg complained to Mr. Ryde about the November 16, 2020 video, Ms. Gregg unexpectedly announced that she was taking a "vacation" for the rest of the year.

152.    Ms. Werneck sent an email to employees with the subject line:

**"A new journey for Marybeth."**

153.    In the email, Ms. Werneck said that Ms. Gregg was taking a three month leave of absence:



154.    Ms. Vega later learned that because Ms. Gregg had complained about the Pena Video, Mr. Ryde forced her to meet with Mr. Ryde's personal hypnotherapist and clairvoyant, Peter Von Ah.[28]

155.    Although his formal role is unclear, it is believed that Hästens "employs" Mr. Von Ah to "advise" Mr. Ryde on employee issues.  Specifically, Mr. Von Ah advises Mr. Ryde about different individuals' vibrational levels, as well as their alleged enlightenment levels.

156.    Troublingly, Mr. Von Ah charges fees to Hastens employees in order to obtain one-on-one sessions with him.

---

[28]     https://peter-vonah.com/;
https://peter-vonah.ch/english;
https://www.infocuslondon.me/entertainment/haestens-brings-168-year-old-sleep-expertise-to-the-digital-world-with-launch-of-new-complimentary-app

157.    Given Mr. Von Ah's ability to banish employees such as Ms. Gregg for perceived bad behavior, the notion that he accepts money from other employees to curry favor is deeply concerning, as well as unlawful.

158.    That Hästens allows and fosters a work culture where employee performance assessments are based on Mr. Von Ah's personal opinions is shocking.

159.    Sadly, this is precisely what happened to Ms. Gregg.

160.    Subsequent to her voiced complaints about the Pena Video, Ms. Gregg had to meet with Mr. Von Ah.

161.    Upon belief, Mr. Von Ah determined (*via* Zoom as Ms. Gregg was at all times located in New Jersey) that she had "very low vibrations."  Because of her purported low vibration frequency, as determined by Mr. Von Ah, Ms. Gregg was forced to take time off to "reflect" on herself and become "fully transparent."

162.    Thereafter, Hästens directed Ms. Gregg not to communicate with any employees, including those in HR, for any reason.

**VII.    Hästens' Retaliatory Termination of Ms. Vega for Raising Complaints**

163.    After Hästens became aware that Ms. Vega had complained about gender-based unlawful conduct and had raised the issue with more than one Company executive, Hästens set upon a course to fire Ms. Vega.

164.    Shortly after the Pena Video incident, Mr. Ryde suddenly and inexplicably excluded Ms. Vega from all of his email communications.  Mr. Ryde kept up such abhorrent retaliation until Ms. Vega was fired on January 7, 2021.

165.    As such, all communications to Ms. Vega that previously would have been sent to her by Mr. Ryde, were re-directed to her *via* Ms. Werneck.   At some point, Ms. Werneck effectively replaced Ms. Gregg.[29]

166.    During this same time, Ms. Vega was pressured to utilize Mr. Ryde and Mr. Downey's preferred pseudoscience philosophies, which turned on "vibrations," "energy" and youth rather than concrete, objectively measured qualifications, when she evaluated potential candidates.

167.    Increasingly, and especially by late November 2020 until she was fired, Ms. Vega's independent evaluations of candidates were marginalized and diminished, only to be replaced by the opinions of the hiring panel.

168.    Mr. Downey's opinions became heavily weighted while Ms. Vega's views were more harshly criticized.

169.    Despite her countless hours spent trying to learn and understand these new, but constantly-changing spiritual principles; Ms. Vega's methods were seen as outdated, unhelpful and sub-par.  In short, she was destined to fail.

170.    Ms. Vega's downward trajectory from an overly successful, high achiever that secured critical executives in key positions for Hästens to that of an expendable, older employee, out of touch with enlightened thought beliefs, coincided with Ms. Gregg's complaint about Mr. Keenan, and subsequent complaints on behalf of herself and Ms. Vega about the Pena Video.

171.    Indeed, there is no question that Mr. Ryde, Mr. Downey and Mr. Von Ah, perceived Ms. Gregg and Ms. Vega to be closely aligned with one another.

172.    On January 7, 2021, Cinthya Werneck called Ms. Vega.   During this call, Ms. Werneck said, *inter alia*:

---

[29]    Notably, prior to being recruited and hired at Hästens, Ms. Werneck utilized Mr. Von Ah's hypnotherapist and clairvoyant services.

> "We have made a business decision…we have changed the way we
> work and we are **ending your local employment with us today**."

173.     Despite clearly terminating her work, Ms. Werneck, knowing that Ms. Vega had a written agreement that gave her additional legal rights, including the right to notice and a right to cure, nevertheless delivered a false offer of continued work.

174.     Specifically, after firing Ms. Vega, Ms. Werneck said that Ms. Vega "could" continue to perform work for the Company "if" three days a week she physically travelled into New York City ("NYC") and worked from a WeWork office located at 500 Seventh Avenue.

175.     Despite the three full days of work, Ms. Werneck said that Ms. Vega "maybe" would receive fifty percent (50%) of her compensation.

176.     During this call, Ms. Werneck said *inter alia*:

> "For the service agreement to continue for the remainder of the term,
> you are required to work at least three full days a week in a WeWork
> office … **for purposes of training your replacement**."

177.     Ms. Werneck also said that Ms. Vega needed to be there in person to "increase togetherness" among employees.

178.     Such a claim was ridiculous because there were no employees regularly working from the WeWork office.

179.     Even before the pandemic, Ms. Vega was not required to be present on specific days, for regular, set hours at the WeWork office located at 500 Seventh Avenue.  During the pandemic, almost all Hästens employees performed the majority of their work remotely.

180.     The post-firing work arrangement proffered by Ms. Werneck was any attempt by Hästens to seize upon the horror of a steep increase in positive Covid-19 rates in the NYC metro area with the hopes that Ms. Vega would refuse to come into NYC to perform work, thereby allowing Hästens to argue that Ms. Vega "quit."

181.    On January 7, 2021, at the time of Ms. Werneck's termination call, NYC was in the midst of a pandemic where the numbers of persons infected with Covid-19 was rising exponentially, and leaders repeatedly urged individuals to stay home unless absolutely necessary.[30]

182.    It is unreasonable for the Company to claim that **"having people in the office and leveraging cooperation and togetherness"** justified Ms. Vega to unnecessarily jeopardize her personal safety and health by frivolously traveling into NYC at the height of the global pandemic.

183.    The idea that Ms. Vega was needed in person in an open shared office space with dozens of persons not even employed by Hästens was offensive and additional, blatant retaliation by Hästens.

**VIII.    Hästens' Second Retaliatory Termination of Ms. Vega's Employment**

184.    On January 11, 2021, after Ms. Vega notified the Company of her legal claims, Hästens doubled-down on its existing shameless proposal to "allow" her to work three days a week from a WeWork office in NYC.

185.    Despite having "fired" her, on January 12, 2021, Hästens inexplicably claimed that Ms. Vega remained an employee and in fact, expected her to be performing work.

186.    Understandably, Ms. Vega continued to perform full-time work.

187.    Thereafter, on or about January 13, 2021, Hästens demoted Ms. Vega.

188.    Specifically, her role, responsibilities and position were diminished.

189.    The Company announced the demotion to the entire HR Team *via* email at 5:18 am EST.

190.    Ms. Werneck also delivered news of the demotion to internal business partners.

---

[30]    https://www.nytimes.com/2021/01/11/nyregion/vaccinations-coronavirus-new-york.html

191.    Ms. Vega's demoted role consisted of sourcing passive resumes, data entry of new employees and referred candidates.

192.    Ms. Werneck, having been trained by Ms. Vega throughout December 2020, assumed responsibility for recruitment responsibilities.

193.    Throughout the day on January 13, 2021, Ms. Vega was systematically removed from trainings previously on her calendar.

194.    Also, on or about January 13, 2021, Ms. Vega began her work day by attending a Global Sales Bootcamp *via* Zoom.

195.    Mr. Ryde gave the employees a "Welcome Address."  Approximately 114 Hästens employees were on the Zoom call.  Among the statements made by Mr. Ryde were:

> "Let's see if I can also get the galleries. I see you all. I say as Keenan, all the losers who have their screen off -- **fuck off or open up your screens or open up your screens.**
> You're either in or you're out.
> It's your choice, you know (it's clearly not)."

196.    Notably, Ms. Vega was one of the employees whose screen was off.  Mr. Ryde made such an outrageous statement to his employees even though during a recent presentation on Global Sales Results, Mr. Ryde's screen was off.

197.    Disgustingly, Mr. Ryde's "welcome address" included other highly offensive and abhorrent comments, including:

**"Vladimir Putin is happier since he bought a Hästens bed and now kills less people because of it."**

198.    Worse, this is not the only time Mr. Ryde made this horrific comment.

199.    In fact, Ms. Vega heard him say the exact comment during his company-wide "Holiday Address" to all employees on or about December 11, 2020 *via* Zoom.  Titled "Christmas celebration and fika."

200.    On January 25, 2021, Ms. Vega gave Tim Dillon, the General Counsel, notice and even more detailed facts regarding her discrimination claims.

201.    Incredibly, on the morning of January 26, 2021, Hästens emailed Ms. Vega a "TERMINATION NOTICE" that provided her "formal notice" that Hästens no longer required her to perform any work for Hästens.  The Company further shut off Ms. Vega's access to all systems and servers.

202.    Hästens and Mr. Ryde must be held accountable for the blatant discrimination and retaliation Ms. Vega has suffered in the hostile work environment fostered by Mr. Ryde.

## FIRST CAUSE OF ACTION
### (Gender Discrimination and Hostile Environment in Violation of Title VII)
### *Against Hästens Entities Only*

203.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

204.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender, age and religion in violation of Title VII by subjecting her to disparate treatment based upon her gender, including, but not limited to, subjecting Plaintiff to sexual harassment, a hostile work environment and terminating her employment.

205.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

206.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

207.    Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

<u>**SECOND CAUSE OF ACTION**</u>
**(Religious Discrimination in Violation of Title VII)**
***Against Hästens Entities Only***

208.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

209.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her religion in violation of Title VII by subjecting her to disparate treatment based upon her religion, including, but not limited to, terminating her employment.

210.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

211.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

212.    Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
#### *Against Hästens Entities Only*

213.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

214.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her complaints of discrimination by subjecting her to a hostile work environment and terminating her employment.

215.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

216.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe physical injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

217.    Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Gender Discrimination Under the NYSHRL)
#### *Against All Defendants*

218.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

219.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender in violation of the NYSHRL, including, but not limited to, by terminating Plaintiff's employment.

220.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

221.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

222.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### *Against Defendant Jan Ryde*

223.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

224.    Defendant Ryde knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL.

225.    As a direct and proximate result of the unlawful conduct of Defendant Ryde in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

226.    As a direct and proximate result of the unlawful conduct of Defendant Ryde, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

227.    Plaintiff is further entitled to an award of punitive damages as Defendant Ryde's unlawful conduct was and remains reckless, wanton and/or malicious.

### SIXTH CAUSE OF ACTION
### (Religious Discrimination in Violation of the NYSHRL)
### *Against All Defendants*

228.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

229.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her creed and/or religion in violation of the NYSHRL, including, but not limited to, by imposing a condition of retaining her employment on adherence to Defendants' religion and terminating Plaintiff's employment.

230.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

231.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

232.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

### SEVENTH CAUSE OF ACTION
### (Retaliation Under the NYSHRL)
### *Against All Defendants*

233.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

234.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including but not limited to, by terminating Plaintiff's employment.

235.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

236.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

237.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

**EIGHTH CAUSE OF ACTION**
**(Gender Discrimination and Hostile Environment Under the NYCHRL)**
***Against All Defendants***

238.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

239.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender in violation of the NYCHRL, including, but not limited to, by subjecting Plaintiff to a hostile work environment and terminating Plaintiff's employment.

240.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

241.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

242.    The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### NINTH CAUSE OF ACTION
**(Aiding and Abetting in Violation of the NYCHRL)**
***Against Defendant Jan Ryde***

243.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

244.    Defendant Ryde knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYCHRL.

245.    As a direct and proximate result of the unlawful conduct of Defendant Ryde in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

246.    As a direct and proximate result of the unlawful conduct of Defendant Ryde in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

247.    The unlawful actions of Defendant Ryde were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount

to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### TENTH CAUSE OF ACTION
### (Religious Discrimination in Violation of the NYCHRL)
### *Against All Defendants*

248.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

249.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her creed and/or religion in violation of the NYCHRL, including, but not limited to, by terminating Plaintiff's employment.

250.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

251.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

252.    The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**(Retaliation Under the NYCHRL)**
*Against All Defendants*

253.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

254.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including, but not limited to, by terminating Plaintiff's employment.

255.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

256.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

257.    The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.      An award of punitive damages in an amount to be determined at trial;

E.      Prejudgment interest on all amounts due;

F.      An award of Plaintiff's reasonable attorneys' fees and costs; and

Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: March 31, 2021
      New York, New York                                Respectfully submitted,

                              **WIGDOR LLP**

                              By: _____
                                  Jeanne M. Christensen

                              85 Fifth Avenue
                              New York, NY  10003
                              Telephone: (212) 257-6800
                              Facsimile: (212) 257-6845
                              jchristensen@wigdorlaw.com

                              *Counsel for Plaintiff*