**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/20/2022

Lizandra Vega,

                                  **Plaintiff,**

                  -against-

Hastens Beds, Inc. et al.,

                                **Defendants.**

1:21-cv-02732 (PGG) (SDA)

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE PAUL G. GARDEPHE, UNITED STATES DISTRICT JUDGE:**

Pending before the Court is a motion by Defendants Hästens Sängar AB ("Hastens AB"), Hästens Ltd. ("Hastens Ltd.") and Jan Ryde ("Ryde") (collectively, the "Foreign Defendants"), pursuant to Rules 12(b)(2) of the Federal Rules of Civil Procedure, to dismiss the Complaint of Plaintiff Lizandra Vega ("Plaintiff" or "Vega") for lack of personal jurisdiction.[1] (Foreign Defs.' Not. of Mot., ECF No. 36.) For the reasons set forth below, I respectfully recommend that the motion to dismiss be DENIED as to Hastens AB and Ryde and DENIED WITHOUT PREJUDICE as to Hastens Ltd.

## BACKGROUND

In this action filed on March 31, 2021, Vega alleges employment-related federal and state law claims for discrimination and retaliation against the Foreign Defendants and a U.S.-based

---

[1] As set forth in the Background section below, the Court previously decided the other, nondispositive grounds upon which the Foreign Defendants' motion was based, which concerned service of process, but deferred making a recommendation with respect to the Foreign Defendants' motion to dismiss for lack of personal jurisdiction. The Court herein makes it recommendation regarding the personal jurisdiction aspect of the Foreign Defendants' motion insofar as it relates to Hastens AB and Ryde.

entity, Hästens Beds, Inc. ("Hastens Beds") (the Foreign Defendants and Hastens Beds, collectively, "Defendants"). (*See* Compl., ECF No. 1, ¶¶ 45-49, 203-57.) She alleges that each of Hastens Beds, Hastens AB and Hastens Ltd. were her "employer" and that Ryde was her "supervisor." (*See id.* ¶¶ 45-49.)

On June 14, 2021, Hastens Beds filed its Answer. (*See* HB Answer, ECF No. 19.) In its Answer, Hastens Beds does not assert as a defense that the Court lacks personal jurisdiction over it. (*See id.*) Hastens Beds also "admits" in its Answer that Vega was "employed by" Hastens Beds. (*See id.* ¶ 45.)

On July 30, 2021, the Foreign Defendants filed a motion to dismiss, pursuant to Rule 12(b)(4) and 12(b)(5) of the Federal Rules of Civil Procedure, for insufficient process and insufficient service of process, and pursuant to Rule 12(b)(2), for lack of personal jurisdiction. (*See* Foreign Defs.' Not. of Mot.) In an Opinion and Order, dated August 28, 2021, the Court found that Vega had failed to show sufficient service of process, quashed service on the Foreign Defendants and provided Vega sixty days to effect service on the Foreign Defendants. *See Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 225 (S.D.N.Y. 2021). However, the Court deferred making a recommendation with respect to the Foreign Defendants' motion to dismiss for lack of personal jurisdiction, pending the conclusion of jurisdictional discovery and supplemental briefing. *See id.* at 226. Familiarity with my August 28, 2021 Opinion and Order is presumed.

On August 30, 2021, Vega effected service upon Hastens AB and Ryde in the manner authorized by the Court. (*See* 8/30/21 Aff. of Service, ECF No. 46.) On November 8, 2021, the

Court granted Vega an extension until March 31, 2022 to effect service on Hastens Ltd.[2] (*See* 11/8/21 Order, ECF No. 69.)

On December 17, 2021, after jurisdictional discovery had concluded as to Hastens AB and Ryde, Vega filed supplemental papers in opposition to the motion by Hastens AG and Ryde to dismiss on personal jurisdiction grounds. (*See* Christensen 12/17/21 Decl., ECF No. 71; Vega 12/17/21 Decl., ECF No. 72; Pl.'s Suppl. Opp. Mem., ECF No. 73.)[3] On January 7, 2022, Hastens AB and Ryde filed their supplemental memorandum, with attachments, in further support of their motion to dismiss on personal jurisdiction grounds.[4] (*See* Defs.' Supp. Mem., ECF No. 79.)

## LEGAL STANDARDS

Certain of the legal standards regarding personal jurisdiction were set forth in my August 28, 2021 Opinion and Order:

> A court may exercise either general or specific personal jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 127, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014). To make out a *prima facie* case of personal jurisdiction, whether based on general or specific personal jurisdiction, a plaintiff must establish both a "statutory basis" for jurisdiction and that the exercise of such jurisdiction accords "with constitutional due process principles." *Cortlandt St. Recovery Corp. v. Deutsche Bank AG*, No. 14-CV-01568 (JPO), 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015) (quoting *Reich*

---

[2] Because Hastens Ltd. has not yet been served, per the Court's August 28, 2021 Opinion and Order, Hastens Ltd. was not required to provide jurisdictional discovery. *See Vega*, 339 F.R.D. at 225 n.14. Thus, the Court's recommendation herein is limited to consideration of personal jurisdiction as to Hastens AB and Ryde.

[3] The supplemental papers filed by Plaintiff on December 17, 2021 were filed under seal since they contained information designated as confidential under the Protective Order entered in this action. On December 30, 2021, public versions of these documents were filed at ECF Nos. 76 to 78 with the confidential information redacted. The Court will address in a separate Order Plaintiff's motion to seal. (*See* Pl.'s 12/20/21 Mot. to Seal, ECF No. 74.)

[4] The supplemental papers filed by Hastens AB and Ryde on January 7, 2022 were filed under seal since they contained information designated as confidential under the Protective Order entered in this action. On January 14, 2021, public versions of these documents were filed at ECF No. 80 with the confidential information redacted. The Court will address in a separate Order the request by Hastens AB and Ryde to seal. (*See* Defs.' 1/14/22 Ltr., ECF No. 81.)

*v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014)). General personal jurisdiction subjects a defendant to suit on all claims. *Id.*; *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011). A court may assert general jurisdiction over a corporation where its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler*, 571 U.S. at 127, 134 S.Ct. 746 (quoting Goodyear, 564 U.S. at 919, 131 S.Ct. 2846). The same test for general jurisdiction applies to individuals. *See Waldman v. Palestine Liberation Org*., 835 F.3d 317, 332 (2d Cir. 2016) ("there is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, or another entity"). Specific personal jurisdiction subjects a defendant to suit only on claims that arise from the defendant's conduct in the forum. *Cortlandt St. Recovery Corp*., 2015 WL 5091170, at *2; *see also Daimler*, 571 U.S. at 126-27, 134 S.Ct. 746.

*Vega*, 339 F.R.D. at 218.

Plaintiff bases personal jurisdiction over the Foreign Defendants in this case upon both general jurisdiction under New York Civil Practice Law and Rules ("CPLR") 301 and specific jurisdiction under New York's long-arm statute, CPLR 302(a).[5] (*See* Pl.'s Opp. Mem. at 15-20.) New York's general jurisdiction statute provides for jurisdiction over "persons, property, or status as might have been exercised heretofore." N.Y. C.P.L.R. 301. A defendant is subject to personal jurisdiction if he or it is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of [his or] its 'presence' in this jurisdiction." *Laufer v. Ostrow*, 55 N.Y.2d 305, 309-10, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982) (quoting *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)). However, an employee who is engaged in business in the state "does not subject himself, individually, to the CPLR 301 jurisdiction of [New York] courts unless he is doing business in our State individually." *Id.* at 313, 449 N.Y.S.2d 456, 434 N.E.2d 692; *see also Wallace Church & Co. Inc. v. Wyattzier*, LLC, No. 20-CV-01914 (CM), 2020 WL 4369850, at *5 (S.D.N.Y. July 30, 2020) (holding that jurisdiction under CPLR 301 did not lie where conduct of individual defendants in New York was within their role as corporate principals); *Brinkmann v. Adrian Carriers, Inc*., 29 A.D.3d 615, 617, 815 N.Y.S.2d 196 (2d Dep't 2006) ("An individual cannot be subject to jurisdiction under CPLR 301 unless he is doing business in New York as an individual rather than on behalf of a corporation.").

---

[5] Although Plaintiff initially had asserted personal jurisdiction upon both general and specific jurisdiction (*see* Pl.'s Opp. Mem., ECF No. 40, at 19-20), in her supplemental memorandum, she only argues for specific jurisdiction under New York's long-arm statute. (*See* Pl.'s Suppl. Opp. Mem. at 8 n.5.). Thus, the Court limits its analysis herein to specific jurisdiction.

New York's specific (long-arm) jurisdiction statute states that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent":

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. 302(a).

CPLR 302 does not distinguish actions taken in a defendant's personal capacity from actions taken in his "corporate" capacity. *See Chloé v. Queen Bee of Beverly Hills*, 616 F.3d 158, 164 (2d Cir. 2010) (CPLR 302 "confers jurisdiction over individual corporate officers who supervise and control an infringing activity"); *Retail Software Servs. Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (upholding long-arm jurisdiction over corporate employees who were "primary actors" in transaction in New York that was source of litigation) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 472, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988)). Where the CEO of an organization exercises extensive control over the day-to-day activities of a corporation, it is "appropriate" for the court to "consider the scope of [the corporation's] activities in New York in evaluating whether it [can] exercise personal jurisdiction over [the CEO]." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016).

*Vega*, 339 F.R.D. at 223-24 (footnote omitted).

Once a *prima facie* showing of a statutory basis for jurisdiction has been made, the plaintiff must "demonstrate that the exercise of personal jurisdiction comports with due process." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81-82 (2d Cir. 2018); *see also*

*Int'l Shoe Co. v. Washingto*n, 326 U.S. 310, 316 (1945). Two separate components are considered under the Due Process Clause analysis: the "minimum contacts" inquiry and the "reasonableness" inquiry. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)). The "minimum contacts" inquiry examines "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id*. The Court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" such that the defendant "should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242-43 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)). The "reasonableness" inquiry examines "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloé*, 616 F.3d at 164 (quoting *Int'l Shoe*, 326 U.S. at 316).

Now that jurisdictional discovery has taken place, Plaintiff's burden has shifted somewhat. "On a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996)). "Where plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing [is] conducted, 'the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if

credited . . . would suffice to establish jurisdiction over the defendant.'" *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Where no evidentiary hearing is held, a court must "evaluat[e], whether [Plaintiff] ha[s], through [her] pleadings and affidavits, made a *prima facie* showing of personal jurisdiction 'notwithstanding any controverting presentation by' [the moving defendant]." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (citation omitted).

<u>DISCUSSION</u>

**I.**     <u>**Personal Jurisdiction Under New York Long-Arm Statute**</u>

After careful review of the record, the Court concludes that, through her Complaint and the Declarations and exhibits she submitted in her initial and supplemental filings, Plaintiff has made a *prima facie* showing of a statutory basis for personal jurisdiction over Hastens AB and Ryde.

**A. <u>Hastens AB</u>**

Plaintiff has made a *prima facie* showing regarding the required elements of New York long-arm jurisdiction over Hastens AB. The record before the Court contains sufficient averments to show that the "Hastens Group" of companies, including Hastens AB and its subsidiary, Hastens Beds, were operated as an integrated unit such that Hastens AB itself was transacting business in New York and that Plaintiff's claims arise from the transaction of such business.

"Personal jurisdiction may . . . be established over a foreign corporation where a subsidiary of the corporation would be subject to jurisdiction in New York." *JGB Enter., Inc., v. Beta Fluid Sys., Inc.*, 135 F. Supp. 3d 18, 26 (N.D.N.Y. 2015) (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)). The "presence of the

subsidiary alone does not establish the parent[] [company's] presence in the state." *Jazini v. Nissan Motor Co*., 148 F.3d 181, 184 (2d Cir. 1998) (citing *Beech Aircraft*, 751 F.2d at 120). "To prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other." *Brown v. Daikin Am. Inc*., 756 F.3d 219, 226 (2d Cir. 2014) (quoting *Parker v. Columbia Pictures Indus*., 204 F.3d 326, 341 (2d Cir. 2000)). A "plaintiff must show that the subsidiary is either an 'agent' or a 'mere department' of the parent corporation in order to exercise personal jurisdiction over the parent." *JGB Enter., Inc*., 135 F. Supp. 3d at 26 (citing *Jazini*, 148 F.3d at 184).

In *Beech Aircraft*, the Second Circuit identified four factors to consider in determining whether a subsidiary is an alter ego or mere department of the parent: "(1) whether there exists common ownership and the presence of an interlocking directorate and executive staff, (2) the degree of financial dependency of the subsidiary on the parent, (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the degree of the parent's control of the subsidiary's marketing and operational policies." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A*., 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (citing *Beech Aircraft*, 751 F.2d at 120-22).

In the present case, Plaintiff's employer, Hastens Beds, transacted business in New York and personal jurisdiction exists over Hastens Beds. The Court below considers each of the *Beech*

*Aircraft* factors to determine if Hastens Beds was a mere department of Hastens AB for personal jurisdiction purposes:[6]

### 1. Common Ownership And Interlocking Directorate And Executive Staff

The "Hastens Group" is a name used for the group of companies of which Hastens AB is the "███████████████," and as to which ████████████████████████." (Robert Carlen ("Carlen") Dep. Tr., ECF No. 71-2, at 76, 78.) As reflected in a document entitled "████████████████████," as of November 3, 2020, ████████████ ████████████████████████████████████████. (Christensen Decl., Ex. 3, ECF No. 71-3.)

Hastens AB is ████████ by Ryde and he is the Chairman of the Board. (Carlen Dep. Tr. at 13-15.) Hastens AB has about ten employees, but no Chief Financial Officer ("CFO") and no Chief Operating Officer ("COO"). (*Id.* at 15.) Carlen, who is "engaged by a service agreement" as CFO of Hastens Ltd. and who reports to Ryde, "support[s] and advis[es] the finance persons [who] are working" at Hastens AB and "advis[es] on the financial matters" as a director at Hastens Beds. (*Id.* at 8, 16, 43.) Marybeth Gregg ("Gregg"), who was engaged by agreement with Hastens Ltd., managed the global Human Resources function for the Hastens Group and "facilitate[ed] hiring globally." (*See id.* at 79, 92-93.) In 2020, Gregg's email signature block listed her with the title "People and Talent Lead" for Hastens AB. (*See* Vega 12/17/21 Decl., Ex. F, ECF No. 72-6.) Plaintiff Vega reported to Gregg who in turn reported to Ryde. (*See* Compl. ¶ 55.) Emails sent by Vega

---

[6] "[T]he exercise of personal jurisdiction over an alleged alter ego [citing *Beech Aircraft*, 751 F.2d at 120-22] requires application of a 'less onerous standard' than that necessary for equity to pierce the corporate veil for liability purposes under New York law." *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196 (2d Cir. 2005) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

during her employment reflect that her signature block included the title "Global Head of Talent Recruitment" above the corporate names "Hästens Limited" and "Hästens Beds, Inc." and the email address "lizandra.vega@hastens.se."[7] (*See* Christensen 8/6/21 Decl., Ex. F, ECF No. 39-6.)

In January 2020, Plaintiff was supplied with an organizational chart for "The Hästens Team." (Vega 12/17/21 Decl., Ex. F.) This organizational chart, which shows ████████ ████████████████████████████████████████████████████████████████ ████," among many other team members, does not distinguish between and among the various companies that are part of the Hastens Group. (*See id.*)

In 2020, Hastens Beds had no corporate officers—*i.e.*, no CEO, no CFO and no COO. (Carlen Dep. Tr. at 50, 64-65.) At that time, Hastens Beds had three directors, Ryde, Carlen and Timothy Dillon ("Dillon").[8] (*Id.* at 50.) Dillon was Managing Director of Hastens Beds, Nicoleta Badea was a finance manager and Robert Santasiero was regional head of sales. (*See id.* at 54.) Badea was part of the "global finance team" for the Hastens Group and "was . . . advised by [Carlen] in [his] capacity as a CFO." (Carlen Dep. Tr. at 56.)

Hastens AB in its supplemental memorandum notes that Hastens AB "████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████." (Defs.' Supp. Mem. at 9.) Based on this ownership structure, Hastens AB argues that this indirect ownership "weighs against a finding of 'common

---

[7] The suffix ".se" is the country code top-level domain for Sweden, where Hastens AB is located. *Vega*, 339 F.R.D. at 214 n.1 (citation omitted).

[8] Ryde resigned as director of Hastens Beds in 2021. (Carlen Dep. Tr. at 50-51.)

ownership.'" (*See id*.) What Hastens AB ignores in making this argument is that ██████████

████████████████████████████████████████████████████████████████████████████,

████████████████████████████████. (*See* Christensen Decl., Ex. 3.)

In sum and substance, ████████████████████████████████████████████████████,

████████████████████████████████. In addition, based on all the foregoing, the record

shows that in 2020 Hastens AB and Hastens Beds each had the same ████████████████ on

its Board of Directors (*i.e.*, Ryde), and shared an executive staff (*e.g.*, Ryde, Carlen and Gregg).

## 2. **Financial Dependency**

There is insufficient evidence in the record for the Court to fully evaluate this factor.

However, the Court notes that the financial affairs of companies in the Hastens Group were

intertwined. The "ownership structure" of the Hastens Group "████████████████████████

████████████████████████████████████████. (Carlen Dep. Tr. at 82.)

According to Carlen, ████████████████████████████████████████████████████

████████████████████████████." (*See id*. at 158.) There was a short-term incentive plan in

place for Hasten Beds employees. ████████████████████████████████████████

████████████████████████████████████████████. (*See id*. at 159-61.) The

plan documents provided to Vega[9] reflected ████████████████████████████████

████████████████████████████████. (*See* Vega 12/17/21 Decl., Ex. J.) Thus, ████████

████████████████████████████████████████████████████████████████████████

---

[9] ████████████████████████████████████████████████████████████████████████
████████████████████████████ (*See* Vega 12/17/21 Decl., Ex.
J, ECF No. 72-10.)

"███████████████████████████████████████████████████████████████"

(Carlen Dep. Tr. at 160), reflecting some degree of financial dependence.[10]

### 3. Involvement In Selection And Assignment Of Executive Personnel

The selection and assignment of executive personnel in the Hastens Group was centrally managed. As set forth above, Hastens Beds had no corporate officers of its own and relied upon executive personnel of the Hastens Group to function, including human resources personnel. As set forth above, the email signature block for Gregg, who managed the global Human Resources function for the Hastens Group, listed her with the title "People and Talent Lead" for Hastens AB. (*See* Vega 12/17/21 Decl., Ex. F.) Gregg was one of the signatories to the January 2020 consulting agreement Hastens Beds entered with Vega and Gregg signed that agreement on behalf of Hastens Beds.[11] (*See* Vega 12/17/21 Decl., Ex. N.) Carlen, who acted as CFO for the Hastens Group, signed Vega's August 2020 offer letter on behalf of Hastens Beds in which she was offered the position as "Global Head of Talent Recruitment." (*See* Vega 12/17/21 Decl., Ex. O, ECF No. 72-15.)

---

[10] The fact that, according to Carlen, ███████████████████████████" (*i.e.*, Hastens Beds) (*see* Carlen Dep. Tr. at 159) appears to be of no moment. Given the effective ████████████ of the Hastens Group companies, and that Hastens Beds ███████████████████████████████.

[11] The consulting agreement that Gregg signed states that Hastens Beds is a "████████████████████████████." (*See* Vega 12/17/21 Decl., Ex. N, ECF No. 72-14). Carlen testified that this was an error and that the principal place of business of Hastens Beds is in New Jersey. (*See* Carlen Dep. Tr. at 37-38, 87-89.) It is telling that, Gregg, a senior executive in the Hastens Group who sometimes worked in Sweden (*see* Vega 12/17/21 Decl. ¶ 4), appears to have confused Hastens Beds for Hastens AB, which is the Hastens Group entity that is headquartered in Sweden. Indeed, as Carlen (who appeared at deposition as a corporate representative of Hastens AB) testified, Hastens AB "has been used sometimes [by Hastens Group employees] when there hasn't been a clear other legal entity." (*See id*. at 6, 148.)

Ryde, the owner of Hastens AB, was intimately involved in the hiring decisions for the entire Hastens Group, working with Vega. (*See* Vega 12/17/21 Decl. ¶ 42.) Vega's job was to recruit senior employees for Ryde on behalf of the Hastens Group and "Ryde not only was the ultimate decider of these hiring positions, but he was involved in the entire recruitment process." (Vega 12/17/21 Decl. ¶ 42.) Further, Gregg, as "coordinat[or] [of all] the HR work . . . certainly consult[ed] with [Ryde]" because of his years of experience with "what has worked [and] what has not worked for [] recruitment." (Carlen Dep. Tr. at 99-101.) Moreover, according to Vega, in the hiring process, "[n]o attempt to distinguish between the various entities [of the Hastens Group] was made," and "reference only was made to certain positions and employees of 'Hästens.'" (*See* Vega 12/17/21 Decl. ¶¶ 19-20.)

Based upon the foregoing, the Court finds that Plaintiff has made sufficient averments that Hastens AB was involved in the selection and assignment of executive personnel of Hastens Beds.[12]

---

[12] The corporate formalities aspect of the third *Beech Aircraft* factor cannot be fully assessed on the present record. Carlen testified that there were no physical board meetings of Hastens Beds in 2019 and that there were no Hastens Beds "board meetings" in 2020, only "meetings," and that Ryde was not present at such meetings. (*See* Carlen Dep. Tr. at 51-53.) Yet, Carlen also testified that Hastens Beds "had really the bare minimum by way of board meeting[s]." (*Id.* at 52.) Since no documents reflecting such board meetings have been submitted to the Court, the Court cannot assess the extent to which Hastens Beds observed corporate formalities.

Hastens AB states in its supplemental memorandum that the "observance for corporate formalities" was "demonstrat[ed]" by the fact that "different individuals, including Plaintiff, were engaged through agreements with separate, distinct Hästens entities for specific business reasons." (Defs.' Supp. Mem. at 11.) However, Hastens AB ignores the fact that one of the agreements with Plaintiff was signed by an individual who Hastens AB claims did not have authority to sign on behalf of the corporate entity that was the party to the agreement. For example, Carlen testified that the consulting agreement that Hastens Beds signed with Vega (*see* Vega 12/17/21 Decl., Ex. N) should not have been signed by Gregg on behalf of Hastens Beds. (*See* Carlen Dep. Tr. at 88 ("[S]he cannot sign on behalf of Hästens Beds, Inc. She doesn't have a standing in that company.").) In addition, the short-term incentive plan documents sent to Vega, a Hastens Beds employee, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (*see* Vega 12/17/21 Decl., Ex. J), even though Hastens Beds did not have a CEO or CFO. The documentary record of agreements before

### 4. **Control Over Marketing And Operational Policies**

The record reflects that Hastens AB, and individuals acting on its behalf, set policy for Hastens Beds and its employees to follow. For example, Gregory Downey was employed by Hastens AB as "a mindset coach in order to drive or help to drive the Hästens as a business in positive direction and to increase sales and increase profitability." (*See* Carlen Dep. Tr. at 106, 108.) Downey was hired by and reported directly to Ryde. (*Id*. at 108; Compl. ¶ 61.) Downey acted as "right-hand man" and "personal advisor" to Ryde. (*See* Vega 12/17/21 Decl. ¶ 29; Compl. ¶ 17.)

Each workday, Downey led Hastens Group employees in 30-minute mindset coaching sessions. (*See* Compl. ¶ 63.) Ryde tracked who was and who was not in attendance. (*See id*. ¶ 65.) The Hastens Employee Handbook referred to these sessions as being part of "company policy." (*See* Compl. ¶ 68 ("If your department lead tells you not to take advantage of mindset coaching or that you do not need to work with a mindset coach, <u>it is a direct violation of company policy and is an attempt to prevent you from reaching your highest potential</u>." (emphasis in original)).)

Hastens AB also set policy regarding Hasten Bed's retail operations. ███████████ ████████████████████████. (Carlen Dep. Tr. at 149.) ██████████████████████ "███████████████████████████ such as Hastens Beds. (*See id*.) In 2020, Hastens Beds had four retail stores in New York City. (*Id*. at 64, 149.) Mikael Brandt, who lives and works in Sweden where Hastens AB is based, and who was "engaged by" Hastens Ltd., coordinated retail

---

the Court thus does not demonstrate the observance of corporate formalities, as Hastens AB suggests, but demonstrates the opposite.

operations on a global basis for the Hastens Group (*see id*. at 122-23), including in New York.[13] In his email signature block in 2020, Brandt identified himself as "global retail manager" for Hastens AB.[14] (*Id*. at 148.) An email from Vega in August 2020 reflects that Brandt was one of the individuals from "global retail" who was going to provide "approval of job descriptions and titles" for Vega in New York. (*See* Vega 12/17/21 Decl., Ex. B, ECF No. 72-2, at PDF p. 3.)

Plaintiff's employment discrimination and retaliation claims against Hastens AB arose out of its transaction of business in New York. Claims "arise from" the transaction of business "when there is 'some articulable nexus between the business transacted and the cause of action sued upon,' or when 'there is a substantial relationship between the transaction and the claim asserted.'" *Best Van Lines*, 490 F.3d at 249 (quoting *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)). Here, the Complaint alleges actionable conduct by Downey, who was a Hastens AB employee, and by Ryde, █████████████████ during the course of Plaintiff's employment. For example, Plaintiff alleges that Downey played sexist, vulgar and homophobic videos during his mindset coaching sessions with Hastens Group employees (including Plaintiff in New York) that are discussed above. (*See* Compl. ¶¶ 123-28.) In addition, Plaintiff alleges that Ryde circulated to Hastens Group employees, including Plaintiff in New York, a link to an offensive video that contained vulgar and inappropriate language in an apparent attempt to motivate employees' sales efforts. (*See id*. ¶¶ 134-41.)

---

[13] In January 2020, Brandt (along with Ryde, Carlen and Gregg) was present at a Hastens retail event in New York. (*See* Carlen Dep. Tr. at 110-12, 122.)

[14] From 2015 to 2019, Brandt was a director of Hastens AB. (Carlen Dep. Tr. at 150, 154.)

In these circumstances, "Plaintiff's claims of discrimination and retaliation would appear to 'relate' to her employment, which was contemplated to, and did, occur in New York." *See Winner v. Tryko Partners, LLC*, 333 F. Supp. 3d 250, 260 (W.D.N.Y. 2018). "Put simply, Defendant reached into New York to create and maintain an ongoing employment relationship with Plaintiff, and Plaintiff's claims against Defendant emerged from that relationship." *See id*. at 360-61.

In sum, after careful consideration of the *Beech Aircraft* factors, the Court finds that Plaintiff has made a *prima facie* showing of personal jurisdiction against Hastens AB "notwithstanding [the] controverting presentation by" Hastens AB, *see Dorchester Fin. Sec., Inc.*, 722 F.3d at 86, such that this case should proceed against Hastens AB.

## B. Ryde

Plaintiff also has made a *prima facie* showing regarding the required elements of New York long-arm jurisdiction over Ryde. As set forth above, an adequate showing of personal jurisdiction has been made as to Hastens AB. Ryde is the Managing Director of Hastens AB (Carlen Dep. Tr. at 85)[15] and Plaintiff has submitted evidence that Ryde was involved in the day-to-day operations of the Hastens Group. In a December 2019 article in *Barron's*, Ryde held himself out as the individual who ran the Hastens Group of companies. (*See* Vega 12/17/21 Decl., Ex. G, ECF No. 72-7, at PDF p. 3 ("When Jan Ryde assumed the helm of the Hästens Group as executive chairman and owner in 1988, he became the fifth-generation family member to run the privately owned Swedish bed company.").)

---

[15] Although there are documents in the record referring to Ryde as "CEO," Carlen explained during his deposition that in Sweden "the term 'CEO' has no legal standing." (Carlen Dep. Tr. at 85.)

Plaintiff has averred that Ryde was involved in day-to-day hiring decisions for the Hastens Group. Plaintiff—who was working as Global Head of Talent Recruitment for the Hastens Group in New York, pursuant to the terms of her offer letter (Vega 12/17/21 Decl., Ex. O)—alleges that Ryde had daily involvement with Plaintiff's work and that "Ryde personally oversaw and controlled almost the entire executive recruitment process for which [Plaintiff] was hired." (Vega 12/17/21 Decl. ¶¶ 10-11.) These allegations are supported by exhibits submitted by Plaintiff. (*See, e.g.*, Vega 12/17/21 Decl., Ex. A, ECF No. 72-1.) For example, in an October 3, 2020 email sent by Ryde to Vega and Gregg, among others, Ryde states that his email "is to complement the earlier feedback given with recruiting every single person to Hästens from now on." (*See id*. at PDF p. 4.)

Plaintiff further alleges that there came a time when Ryde became the direct supervisor of her New York-based employment with the Hastens Group. (*See* Vega 12/17/21 Decl. ¶ 10.) In addition, she alleges that Downey—a Hastens AB employee who displayed to Hastens Group employees, including Plaintiff in New York, the offensive videos described above—acted as "right-hand man" to Ryde. (*See* Vega 12/17/21 Decl. ¶ 29; Compl. ¶ 17.) Based upon these allegations, there are sufficient averments of fact to establish personal jurisdiction over Ryde based upon his conduct on behalf of Hastens AB. *See EMI Christian Music Grp., Inc*., 844 F.3d at 98 (2d Cir. 2016) (affirming district court's imputation of contacts of corporation to individual defendant who was founder and CEO and had "extensive control over . . . day-to-day activities").

Relying upon *Avecmedia, Inc. v. Gottschalk*, No. 03-CV-07831 (BSJ), 2004 WL 1586411 (S.D.N.Y. July 14, 2004), Ryde argues that he is not subject to personal jurisdiction because he was not aware that Plaintiff was performing work in New York. (*See* Defs.' Supp. Mem. at 14; *see*

*also* Ryde Decl., ECF No. 79-5, ¶ 5 ("Throughout Plaintiff's employment, I had no knowledge that she was performing work in New York State for any Hästens entity.").) At the outset, this argument is based upon a dubious premise, *i.e.*, that Ryde did not know that Plaintiff was performing work in New York. Ryde himself received emails from Vega containing a signature block listing her location as "New York, New York USA." (*See* Vega Decl., Ex. E, ECF No. 72-5, at PDF p. 5.)

In any event, *Avecmedia, Inc.*, the case relied upon by Ryde, is inapposite. In *Avecmedia, Inc.*, the defendant over which personal jurisdiction was sought in a New York court "clearly did not know that [the plaintiff corporation's] personnel were working from New York, and [the plaintiff corporation] did not inform [defendant] that its employees were working from New York home offices." *Avecmedia, Inc.*, 2004 WL 1586411, at *6. Moreover, the plaintiff was "a Connecticut corporation . . . headquartered in Connecticut" and the "business cards of the two [plaintiff corporation] employees . . . indicated that their addresses were in Norwalk, Connecticut." *Id*.

Here, by contrast, Plaintiff's offer letter with Hastens Beds stated that her "place of work is her home address in Briarcliff Manor, New York or in the Hastens Beds, Inc. offices in New York, New York." (*See* Vega 12/17/21 Decl., Ex. O.) Ryde was well aware that there were Hastens Beds employees like Plaintiff working in New York since Hastens Beds had retail stores in New York and Ryde personally had visited one of the retail stores in January 2020.[16] (*See* Carlen Dep. Tr. at

---

[16] In addition, according to the interview Ryde gave to *Barron's*, published in December 2019, the Hastens Group partnered with the Lotte New York Palace hotel, a New York hotel, to develop a "Hästens Ultimate Sleep Suite" (Vega 12/17/21 Decl., Ex. G, at PDF p. 3), and in January 2020 while in New York, Ryde stayed at the Lotte New York Palace Hotel. (Carlen Dep. Tr. at 119-20.) Ryde thus was aware that the Hastens Group had created a business relationship with a New York hotel.

110-11.) Ryde "knew, in other words, that [Hastens Beds] had purposefully availed itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." *See EMI Christian Music Grp., Inc.*, 844 F.3d at 98 (cleaned up); *see also Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 261 (S.D.N.Y. 2019) (finding where CEO of corporation was "intimately involved in [corporation's] day-to-day operations," it was "at least plausible that [CEO] 'exercised some control' over [corporation] in establishing the[] New York connections[.]").

Further, as set forth above, Plaintiff's employment discrimination and retaliation claims against Ryde arise out of Ryde's own conduct (and that of Downey, his "right-hand man") towards Plaintiff in New York. (*See* Compl. ¶¶ 123-28, 134-41.)

## II.   <u>Constitutional Due Process</u>

The exercise of personal jurisdiction over Hastens AB and Ryde is consistent with the Constitution's due process requirements. First, Plaintiff has averred sufficient facts to make out a *prima facie* case that the contacts that Hastens AB and Ryde had with the State of New York, where Plaintiff was based, gave rise to the instant case. With respect to Hastens AB, it operated in an integrated fashion in New York by and through its controlled subsidiary, Hastens Beds. Moreover, Hastens AB's employee, Downey, conducted coaching sessions with Hastens Group employees in New York, in which he displayed offensive videos. With respect to Ryde, he supervised Plaintiff in New York. Moreover, he sent an offensive video to Plaintiff in New York. Finally, he was intimately involved in business operations of the Hastens Group in New York.

Second, Hastens AB and Ryde have not demonstrated that the exercise of personal jurisdiction would be unreasonable in this case. Although it may be less convenient for them to defend a suit in New York, "the conveniences of modern communication and transportation ease

any burden the defense of this case in New York might impose on [Defendant]." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 174 (2d Cir. 2013) (citation omitted). Moreover, the State of New York has an interest in providing an "effective means of redress for its residents," *Eades v. Kennedy, PC L. Offs*., 799 F.3d 161, 169 (2d Cir. 2015), and ensuring that "parties transacting business in New York comply with the law." *Persh v. Petersen*, No. 15-CV-01414 (LGS), 2016 WL 4766338, at *8 (S.D.N.Y. Sept. 13, 2016).

Because Plaintiff has averred facts sufficient to support a finding of specific jurisdiction over Hasten AB and Ryde, the Court recommends that their motion to dismiss the Complaint for lack of personal jurisdiction be denied.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the motion to dismiss for lack of personal jurisdiction as to Hastens AB and Ryde be DENIED. I also recommend that the motion to dismiss as to Hastens Ltd. be DENIED WITHOUT PREJUDICE to renewal after Hastens Ltd. has been served, and after Hastens Ltd. has provided jurisdictional discovery.

## FILING UNDER SEAL

In light of the fact that the parties have redacted and/or filed nearly all of their submissions on the pending motion under seal, the Court initially files this Report and Recommendation under seal. After the Court's forthcoming rulings on the pending requests to seal, the Court shall direct the parties shall file a joint letter with the Court setting forth the

parties' positions as to which parts of this Report and Recommendation, if any, should be maintained under seal.

Dated:      January 20, 2022
              New York, New York

                                  **STEWART D. AARON**
                                  **United States Magistrate Judge**

                  *            *            *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Any requests for an extension of time for filing objections must be addressed to Judge Gardephe.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).